Slip Op. 16-116

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ENERGIZER BATTERY, INC.,<br><br>　　　Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>　　　Defendant. | Before: Mark A. Barnett, Judge<br><br>Court No. 13-00215 |

OPINION

[The court finds that Plaintiff's U.S. assembly operation does not constitute a substantial transformation and, therefore, Plaintiff's Generation II flashlight is not of U.S. origin. The court, therefore, denies Plaintiff's Motion for Summary Judgment and grants Defendant's Motion for Summary Judgment.]

Dated:  December 7, 2016

M. Jason Cunningham, Sonnenberg & Cunningham, Ltd., of Naples, FL for Plaintiff.  Of counsel on the brief was Steven P. Sonnenberg, Sonnenberg & Cunningham, Ltd., of Chicago, IL.

Jason M. Kenner, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, for Defendant.  With him on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, Amy M. Rubin, Assistant Director.  Of counsel on the brief was Chi S. Choy, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection of New York, NY.

Barnett, Judge:  Plaintiff, Energizer Battery, Inc. ("Energizer"), challenges the

final determination issued by U.S. Customs and Border Protection ("CBP" or "Customs")

on April 29, 2013 ("Final Determination") concerning the country of origin of a second

generation military flashlight produced by Energizer ("Generation II flashlight") for

purposes of government procurement under the Trade Agreements Act of 1979 ("1979

Act"). HQ H215657 (April 29, 2013), available at 2013 WL 2297571; *see also Notice of*

*Issuance of Final Determination Concerning Generation II Military Flashlights*, 78 Fed.

Reg. 26,058 (Customs and Border Protection, May 3, 2013) ("Final Det.").  Plaintiff and

Defendant, United States, both filed motions for summary judgment and the motions are

fully briefed.  Pl.'s Mot. for Summ. J., ECF No. 40 ("Pl.'s MSJ"); Def.'s Mot. for Summ. J.

and Def.'s Mem. in Supp. of its Mot. for Summ. J., ECF No. 38 ("Def.'s MSJ").  The

court has jurisdiction pursuant to 28 U.S.C. § 1581(e).[1]  For the reasons set forth below,

the court grants Defendant's motion for summary judgment and denies Plaintiff's motion

for summary judgment.

## Background

Energizer submitted a request for a final determination of country of origin of its

Generation II flashlight and replacement lens head subassembly to CBP on March 28,

2012.  Pl. Energizer Battery, Inc.'s Rule 56.3 Statement of Undisputed Material Facts

with Pl.'s Mot for Summ. J., Ex. 1 ("Energizer Ruling Req."), ECF No. 41-1.  CBP issued

its Final Determination, HQ H215657, on April 29, 2013.  *See* Final Det. at 78 Fed. Reg.

26,058.  The notice of Final Determination was published in the Federal Register on

May 3, 2013.  78 Fed. Reg. 26,058.

In its Final Determination, CBP found:

virtually all of the components of the military Generation II flashlight,
including the most important component, the LED, are of Chinese origin.
All of the components arrive in the United States ready for assembly into
the Generation II flashlight.  Only the assembly process is done in the

---

[1] All references to the United States Code are to the 2012 edition, unless otherwise
stated.

> United States . . . [M]ost of this work consists of rather simple insertions, relatively simple attaching and fastening of the components and parts together.

Final Det., 78 Fed. Reg. at 26,060.  As a result, CBP determined:

> the imported components of the flashlight and replacement lens head subassembly are not substantially transformed as a result of the described assembly operations and programming operations performed in the United States.  The country of origin for government procurement purposes of the Generation II military flashlight is China.

*Id.* at 26061.  Energizer timely filed this action on May 31, 2013.  Compl., ECF No. 2.

### Material Facts Not in Dispute

The Generation II flashlight is comprised of approximately fifty[2] different

---

[2] Plaintiff states there are "approximately fifty" components and Defendant does not challenge this assertion.  *See* Pl. Energizer Battery, Inc.'s Rule 56.3 Statement of Undisputed Material Facts with Pl.'s Mot for Summ. J. ("Pl.'s SOF") ¶ 7, ECF No. 41; Def's Responses to Pl.'s Rule 56.3 Statement of Material Facts ("Def.'s Resp. to Pl.'s SOF") ¶ 7, ECF No. 48.  Defendant separately refers to there being fifty-five parts and Plaintiff does not object.  Def.'s Statement of Material Facts As To Which There Are No Genuine Issues To Be Tried ("Def.'s SOF") ¶ 11, ECF No. 9; Pl's Resp. to Def.'s Statement of [Material] Facts As To Which There Are No Genuine Issues To Be Tried ("Pl.'s Resp. to Def.'s SOF") ¶ 11, ECF No. 49.

Plaintiff's ruling request to CBP included cost and component sheets showing the discrete components that make up the Generation II flashlight.  *See generally* Energizer Ruling Req., Confidential Attach. A ("Customs List") at 14-21, ECF No. 41-1; *see also* Def.'s MSJ, Ex. 2 ("Def.'s Ex. 2"), ECF No. 38-3.  The court requested that Plaintiff distinguish any components that could be characterized as screws, washers or nuts, as well as any components that are imported into the United States in pre-assembled form.  Letter Filed by Court (June 30, 2016), ECF No. 55.  In response, Plaintiff provided a Supplemental Statement of Material Facts, in which Plaintiff identified forty-one components, identified the screws, washers and nuts on the list and separated the pre-assembled lens head subassembly.  Pl.'s Energizer Battery, Inc.'s Suppl. Statement of Material Facts Pursuant to Rule 56.3 at 1, 4-5 ("Pl.'s Suppl. Facts"), ECF No. 59 ("Court List").

The Court List and the Customs List do not reconcile, and Defendant objects to the Court List, noting Plaintiff's failure to cite to admissible evidence in support of its

components.  Pl.'s SOF ¶ 17; Def's Resp. to Pl.'s SOF ¶ 7.[3]  It contains five light-

emitting diodes ("LEDs") in white, red, green, blue, and infrared.  Pl.'s SOF ¶ 10; Def.'s

Resp. to Pl.'s SOF ¶ 10.  Other than the white LED and the hydrogen getter, all

components of the Generation II flashlight are of Chinese origin.[4]  Def.'s SOF ¶ 12; Pl.'s

Resp. to Def.'s SOF ¶ 12.

    The white LED wafer in the Generation II flashlight is grown and sliced into dies,

and then tested and sorted in the United States, in Durham, North Carolina.  Pl.'s SOF

¶¶ 32, 38-39; Def.'s Resp. to Pl.'s SOF ¶¶ 32, 38-39.  The sorted dies are then sent to

China for packaging.  Pl.'s SOF ¶ 42; Def.'s Resp. to Pl.'s SOF ¶ 42.  During packaging

in China, each die is glued to an aluminum pad, a thermally conductive pad with an

electrically nonconductive coating.  Pl.'s SOF ¶ 44; Def.'s Resp. to Pl.'s SOF ¶ 44.  Two

---

statements.  Def.'s Resp. to Pl.'s Suppl. Statement of Material Facts Pursuant to Rule
56.3 ("Def.'s Resp. to Pl.'s Suppl. Facts") at 6-7, ECF No. 60.
    Based on the two lists, the Generation II flashlight head subassembly, imported
from China, is comprised of eight components listed separately in the Customs List;
additionally, the Customs List includes nineteen components that could be classified as
screws, washers or nuts, none of which were used in the head subassembly
preassembled in China.  *Compare* Customs List at 18-19, *with* Court List.  In total, the
Customs List includes fifty-five distinct (i.e. not counting multiples) components and
seventy-four total components, whereas the Court List includes thirty-six distinct and
forty-nine total components.  Customs List at 18-19; Court List.  The differences in the
number of components is largely the result of the pre-assembled head subassembly;
however, any remaining differences are immaterial to the Court's finding.
[3] Citations within the Statements of Fact are omitted.
[4] According to Plaintiff's Court List, five of the Generation II flashlight components are of
"unknown" origin (tinning solution, solder, the thermal grease unit, silicon and Loctite).
*See* Court List.  All are compounds that facilitate the assembly process rather than
individualized components of the Generation II flashlight.  Plaintiff refers to these as
"substance components" and Defendant does not object to the use of this term.  Pl.'s
Suppl. Facts at 2; Def.'s Resp. to Pl.'s Suppl. Facts at 3-4.

small wires are attached to each side of the LED and phosphor is sprayed on the LED

die to convert the light it emits from blue to white. *Id.* At this stage, the LED has

"terrible irregular light radiation patterns." *Id*. The irregular light radiation pattern is

corrected by the addition of a TIR (total internal reflection) lens at Energizer's Vermont

facility ("Vermont facility"). Pl.'s SOF ¶ 45; Def.'s Resp. to Pl.'s SOF ¶ 45.

All of the components that comprise the Generation II flashlight, other than the

electrical wire and red LED, are specifically designed for use in the Generation II

flashlight. Def.'s SOF ¶ 13; Pl.'s Resp. to Def.'s SOF ¶ 13. The electrical wires are cut

to lengths specific to the Generation II flashlight and the red LED is soldered to the

Generation II flashlight printed circuit board prior to importation. Def.'s SOF¶¶ 14, 15;

Pl.'s Resp. to Def.'s SOF ¶¶ 14, 15. The lens head subassembly of the Generation II

flashlight is also partially assembled in China, prior to importation into the United States.

This partial assembly consists of attaching the red, green, blue, and infrared LEDs to

the head printed circuit board ("head PCB"), soldering six of the multi-cord wires to the

head PCB, and running all eight of the multi-cord wires through one hole of the yoke

and one hole of the head with overmold. Def.'s SOF ¶ 16; Pl.'s Resp. to Def.'s SOF ¶

16.

The final assembly and packaging of the Generation II flashlight occurs at two

work stations ("Work Station I" and "Work Station II") at Energizer's facility in Vermont.

Def.'s SOF ¶¶ 18, 19; Pl.'s Resp. to Def.'s SOF ¶¶ 18, 19. At Work Station I, a worker

completes assembly of the lens head subassembly (imported from China partially

assembled). Def.'s SOF ¶ 20; Pl.'s Resp. to Def.'s SOF ¶ 20. At Work Station II, a

worker assembles the lens head subassembly with the remaining Generation II

flashlight components, tests the final product, and places the finished Generation II

flashlight in a box.  Def.'s SOF ¶ 21; Pl.'s Resp. to Def.'s SOF ¶ 21.

The assembly, testing and boxing of a Generation II flashlight at the Vermont

facility takes approximately seven minutes and ten seconds.  Def.'s SOF ¶¶ 22, 23; Pl.'s

Resp. to Def.'s SOF ¶¶ 22, 23; *see also* Pl.'s SOF, Ex. 5 ("Energizer Communications to

CBP") at 8, ECF No. 41-5.  Energizer submitted a digital video recording (DVD) of its

process at both work stations.  See Pl.'s Manually Filed Exhibits to its Statement of

Undisputed Material Facts ("Pl.'s DVD"), ECF No. 43; Def.'s Manually Filed Exhibits to

its Mot. for Summ. J. ("Def.'s DVD"), ECF No. 42.  The assembly in the video is at a

slower pace than regular operations because it is not performed by fully trained

operators under production conditions; rather, it is performed to demonstrate more

clearly the steps involved.  Pl.'s SOF ¶ 25; Def.'s Resp. to Pl.'s SOF ¶ 25.  The

assembly process, as shown on the DVD, takes approximately thirteen and a half

minutes, including testing, which takes approximately three and a half minutes.  *See*

Pl.'s DVD; Def.'s DVD.

The assembly operations performed at the Vermont facility do not require a

change in the shape or material composition of any imported component.  Def.'s SOF

¶¶ 24-25; Pl.'s Resp. to Def.'s SOF ¶¶ 24-25.  At the time of importation, each

component used in producing the Generation II flashlight is intended for use in a

finished Generation II flashlight.  Def.'s SOF ¶ 26; Pl.'s Resp. to Def.'s SOF ¶ 26.  As a

result of the assembly operations performed at the Vermont facility, each of the

imported components become part of a finished Generation II flashlight.  Def.'s SOF ¶ 27; Pl.'s Resp. to Def.'s SOF ¶ 27.

The finished cost of a Generation II flashlight is $23.55,[5] including parts and U.S. production costs, 45 percent of which is attributed to U.S. production costs.  Pl.'s SOF ¶ 54; Def.'s Resp. to Pl.'s SOF ¶ 54.[6]  The total landed value of the imported components used in the production of the Generation II flashlight, including parts, duties, transportation and all costs is $12.96.  Pl.'s SOF ¶ 52; Def.'s Resp. to Pl.'s SOF ¶ 52.

## Standard of Review

The court will grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" based on the materials in the record.  Fed. R. Civ. P. 56(a).  The burden of demonstrating the absence of a genuine issue of material fact lies with the moving party.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The court must view the evidence in the light most favorable to the non-movant and may not weigh the evidence, assess the

---

[5] Plaintiff identified the cost-related information as business confidential information in its Statement of Facts, Pl.'s SOF ¶¶ 50-55, however, Plaintiff filed the Statement of Facts as a public document.  *See generally* Pl.'s SOF ¶¶ 50-55.  Plaintiff also made this information public in its motion for summary judgment.  *See* Pl.'s MSJ at 11-12.  Accordingly, this information is treated as public information.

[6] While Defendant only admitted that Plaintiff's mathematical calculation was correct, it did not contend that there was a genuine issue of material fact in regard to these figures or otherwise controvert these facts as required by USCIT Rule 56.3(b) and (c).  Nevertheless, while the court includes discussion of these facts for completeness, they are not material to the court's decision.

credibility of witnesses, or resolve issues of fact.  *See Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 249, 255 (1986).

When parties have filed cross-motions for summary judgment, the court must

evaluate each party's motion on its own merits, drawing all reasonable inferences

against the party whose motion is under consideration.  *Mingus Constructors, Inc. v.*

*United States*, 812 F.2d 1387, 1391 (Fed.Cir. 1987).  Here, the material facts are

undisputed.  The only issue before the court is the legal issue of whether those

undisputed facts support a finding of substantial transformation of the imported

components.  Accordingly, a grant of summary judgment for either side, based on the

pleading and supporting documents, is appropriate.

This case is brought pursuant to 28 U.S.C. § 1581(e), which gives the court

jurisdiction to review "any final determination of the Secretary of the Treasury under

section 305(b)(1) of the Trade Agreements Act of 1979."  Section 2640(a)(3) of Title 28

of the U.S. code further provides that the court will "make its determinations upon the

basis of the record made before the court" for cases "commenced to review a final

determination made under section 305(b)(1) of the Trade Agreements Act of 1979."

Legislative history corroborates that 28 U.S.C. § 2640 provides for *de novo* review of

cases brought pursuant to section 305(b)(1) of the Trade Agreements Act of 1979.[7]  As

such, while the court may accord deference to a Customs final determination relative to

---

[7] "Subsection (a)(3) provides for a trial *de novo* in a civil action commenced pursuant to
section 305(b)(1) of the Trade Agreements Act of 1979.  This provision is in accord with
the intent of that act."  H.R. Rep. 96-1235, 59 (1980) (capitalization omitted).

its power to persuade, the court will make its determination on the basis of the record created in the instant proceeding.  *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see also United States v. Mead Corp.*, 533 U.S. 218, 235 (2001).

<h3 style="text-align:center">Statutory and Regulatory Framework</h3>

This case concerns the government procurement provisions of the Trade Agreements Act of 1979, the so-called "Buy America Act" provisions.  19 U.S.C. §§ 2511-2518.[8]  The Act defines "eligible product" as a "product or service" of a country or instrumentality covered by the Act, 19 U.S.C. § 2518(4)(A), and explains the "rule of origin" as follows:

> An article is a product of a country or instrumentality only if (i) it is wholly the growth, product, or manufacture of that country or instrumentality, or (ii) in the case of an article which consists in whole or in part of materials from another country or instrumentality, it has been substantially transformed into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was so transformed.

19 U.S.C. § 2518(4)(B).  Accompanying regulations do not provide further guidance on interpreting the term "substantial transformation."  *See generally* 19 C.F.R. §§ 177.21 - 177.31.  Regulations give CBP the authority to provide advisory rulings and final determinations on country of origin of merchandise, 19 C.F.R. § 177.22(b)-(c), and CBP's final determinations are reviewable by the court.

---

[8] The 1979 Act permits the President to waive the "Buy America Act" for the purpose of government procurement for certain "eligible products" from specifically designated foreign countries.  19 U.S.C. § 2511(a).  China, however, is not among the categories of specifically designated foreign countries.  *See* 19 U.S.C. § 2511(b).  Therefore, the only relevant question for purposes of this action is whether the Generation II flashlights are of U.S. origin.

The Court of International Trade has not previously interpreted the meaning of "substantial transformation" as used in the 1979 Act.  The relevant regulations repeat the statutory language, providing that the transformation must result in a "new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was so transformed."  *See* 19 U.S.C. § 2518(4)(B); 19 C.F.R. §177.22.  The court, therefore, will look to similar country-of-origin statutes and regulations to assist in its interpretation of the statutory provisions in question.[9]  *See Brown v. Duchesne*, 60 U.S. 183, 194 (1856) ("it is well settled that, in interpreting a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute (or statutes on the same subject) and the objects and policy of the law"); *American Airlines, Inc. v. United States*, 551 F.3d 1294, 1303 (Fed. Cir. 2008) ("the plain language of analogous statutory language is normally read in the same way"); *Ashland Chem. Co. v. United States*, 7 C.I.T. 362, 365, 367 (1984) (prior judicial interpretation of identical terms in analogous statutes is relevant); *United States v. Freeling*, 31 F.R.D. 540, 549 (S.D.N.Y. 1962) ("by well established canons of statutory construction statutes which use identical words in the same sense are to be construed in *pari materia*, or with reference to one another").

---

[9] The court simply notes that the legislative history of these provisions is not illuminating.  It indicates that Congress intended the "rule of origin" to be the U.S customs rule for Most-Favored-Nation (MFN) purposes.  S. Rep. 96-249, 140 (1979).

**Discussion**

I.   <u>CBP's Final Determination</u>

        Plaintiff challenges CBP's Final Determination and argues that CBP gives undue

weight to the "essential character" analysis in reaching its conclusion.  Pl.'s MSJ at 13.

Defendant responds that "in its ruling, Customs discussed all of the relevant factors,

including the fact that nearly every component of the [Generation II] flashlight is

Chinese, that the components arrive ready for assembly, and that the assembly process

is not complex and requires only a few minutes," leading to CBP's conclusion that "U.S.

assembly operations were insufficient to substantially transform the foreign

components."  Def.'s Mem. in Opp'n. to Pl.'s Mot. for Summ. J. ("Def.'s Resp. to Pl.'s

MSJ") at 8-9, ECF No. 47.  Plaintiff replies that "Defendant's further abandonment of

CBP's analysis of the white LED's origin is dispositive" and Defendant's concession that

an essential character analysis is improper should result in this court granting Plaintiff's

motion for summary judgment.  Pl.'s Reply to Def.'s Mem. in Opp'n. to Pl.'s Mot. for

Summ. J. ("Pl.'s Reply") at 2-3, ECF No. 54 (formatting and capitalization omitted).

        Plaintiff appears to misunderstand the court's standard of review.  The court

reviews § 1581(e) cases brought pursuant to the 1979 Act *de novo,* on the basis of the

record created before the court.  *See* 28 U.S.C. § 2640(a)(3).  While the court may give

*Skidmore* deference to CBP's final determination relative to its power to persuade, the

fact that CBP may have incorrectly applied a legal test in its analysis or that Defendant

may have abandoned CBP's analysis in its briefing to the court is neither dispositive nor

sufficient reason for the court to find in Plaintiff's favor. *See Skidmore,* 323 U.S. at 140; *see also Mead*, 533 U.S. at 235.

In the Final Determination, CBP described the substantial transformation analysis as one that is based on the "totality of circumstances" and that is conducted on a "case-by-case" basis. Final Det., 78 Fed. Reg. at 26,059. CBP further noted that "[t]he country of origin of the item's components, extent of the processing that occurs within a country, and whether such processing renders a product with a new name, character and use are primary considerations in such cases." *Id.* While no factor is decisive, the "key issue is the extent of operations performed and whether the parts lose their identity and become an integral part of the new article." *Id.* Applying the above to the Generation II flashlight, CBP determined that the "foreign made components and parts do not undergo a substantial transformation when they are assembled together in the United States." *Id.* at 26,060. CBP further described the assembly process as "putting together a number of different parts to produce the flashlight" and stated that "most of this work consists of rather simple insertions, relatively simple attaching and fastening of the components and parts together . . . following a fairly straightforward routine and [it] does not seem to be exceptionally complex, and it only takes several minutes to complete." *Id.*

CBP's Final Determination, regardless of its ultimate conclusion, does not apply the substantial transformation test with clarity. The statute and regulations require that, in order for a product to be substantially transformed, it must become a "new and different article of commerce with a name, character, or use distinct from that of the

article or articles from which it was so transformed."  19 U.S.C. § 2518(4)(B).  While the

Final Determination identifies the proper test, it does not examine in detail whether the

imported components of the Generation II flashlight undergo a change in name,

character, or use.  Instead, the Final Determination focuses its analysis on the

complexity of assembly operations and makes repeated reference to the origin of the

LED for the "essential character" it imparts to the final product.  *See generally* Final

Det., 78 Fed. Reg. at 26,060.  As the court discusses below, the nature of the post-

importation processing provides useful context for the name, character, or use test, but

it is not the sole determining factor of the test.  Similarly, "essential character" is not an

established factor in the substantial transformation analysis, although some courts have

looked to the "essence" of a finished article in order to evaluate whether there has been

a change in character as a result of post-importation processing.[10]  Regardless of

whether CBP applied the proper test or explained its findings with sufficient clarity, the

court has an independent duty to conduct its own legal and factual analysis on the basis

of the record developed before it.   *See* 28 U.S.C. § 2640(a)(3).

   II.   Substantial Transformation

        Plaintiff argues that the Generation II flashlight is a U.S. origin product pursuant

to the 1979 Act because the Chinese components were substantially transformed when

---

[10] *See, e.g., Uniden Am. Corp. v. United States*, 24 CIT 1191, 1195, 120 F. Supp. 2d 1091, 1095 (2000).  Unlike in the country-of-origin context at issue here, essential character is an established test in customs classification General Rules of Interpretation ("GRI") analysis.  That is a separate body of law and inapplicable to the issues currently before the court.

assembled into the flashlight in the United States.  Pl.'s MSJ at 9.  Energizer asserts

that the assembly process is "not a simple screwdriver assembly of a few components,

but requires trained operators at two separate workstations working for approximately

seven minutes per flashlight."  Pl.'s MSJ at 10 (internal quotations omitted).

Additionally, Energizer argues that the large number of parts required for the "two-stage

production process" show there is a substantial transformation, and "the costs

associated with the [Generation] II flashlight" further support this conclusion.  Pl.'s MSJ

at 11.[11]  Defendant argues that the imported "components are not substantially

transformed simply by being assembled into the very article they were designed and

intended to create," and that Energizer's processing is "too minimal" to substantially

transform the components into a U.S. product.  Def.'s MSJ at 9-10.  Defendant argues

that Generation II flashlight components have the same name, character, and use as

various flashlight parts upon importation as they do after the assembly process, but that

"they have just been combined into a collective article; i.e[.] a flashlight."  Def.'s MSJ at

12 (italicization omitted).

Substantial transformation is a concept frequently used in customs law; however,

to-date, only the Court of Federal Claims has interpreted substantial transformation

pursuant to the 1979 Act.  *See Ran-Paige Co., Inc. v. United States*, 35 Fed. Cl. 117

(1996); *see also Klinge Corp. v. United States,* 82 Fed. Cl. 127 (2008) (plaintiff sought

---

[11] Plaintiff cites to costs associated with research and development ($550,000), U.S. origin software, and labor costs relative to the imported components.  Pl.'s MSJ at 11.

injunctive relief on a bid protest).[12]  The court, therefore, looks to judicial interpretations of identical language in cases involving country-of-origin marking, duty drawback, transshipment, voluntary restraint agreements, and the generalized system of preferences ("GSP").[13]  Regardless of the applicable statutory provision, substantial transformation analysis is fact-specific and cases that are analogous in terms of the nature of post-importation processing are particularly useful to the court's analysis.

The "name, character, or use" test can be traced back to a Supreme Court decision in a drawback case in which the Court was asked to determine the meaning of "manufacture" for the purpose of determining the country of origin.  *See, e.g., Anheuser Busch Brewing Ass'n v. United States*, 207 U.S. 556 (1908).  The Court found that, in

---

[12] The Court of International Trade has only been called upon to interpret the 1979 Act in one prior case and, at that time, was not asked to analyze the issue of substantial transformation.  *See Xerox Corp. v. Unites States*, 35 CIT __, 753 F. Supp. 2d 1355 (2011).

[13] For example, CBP regulations that give effect to the country-of-origin marking statute contain language identical to the statutory language in the government procurement provisions of the 1979 Act.  As codified at 19 U.S.C. § 1304 *et seq.,* the marking statute requires CBP to determine the country of origin of products.  *See* 19 U.S.C. § 1304(a) ("every article of foreign origin . . . shall be marked . . . in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article.")   Corresponding regulations provide that the country of origin is "the country of manufacture, production, or growth of any article of foreign origin entering the United States.  Further work or material added to an article in another country must effect a substantial transformation in order to render such other country the 'country of origin' within the meaning of this part."  19 C.F.R. § 134.1(b).  An article substantially changed by manufacture within the United States will be exempt from such marking, if it "results in an article having a name, character, or use differing from that of the imported article."  19 C.F.R. § 134.35(a).  The case-law on substantial transformation in the country of origin marking context is well-developed.  *See, e.g. Nat'l Hand Tool Corp. v. United States*, 16 CIT 308, 310, *aff'd*, 989 F.2d 1201 (Fed. Cir. 1993); *Uniroyal, Inc. v. United States*, 3 CIT 220, 224, 542 F. Supp. 1026, 1029, *aff'd*, 702 F.2d 1022 (Fed. Cir. 1983)*.*

order for an article to be the growth, product or manufacture of a country, it must

undergo processes that result in transformation such that "a new and different article

must emerge, having a distinctive name, character, or use." *Id.* at 562.  The *Anheuser-*

*Busch* test has since "evolved into a highly flexible 'name, character or use' test, also

known as the 'substantial transformation' test," that is used to determine whether an

article has been "subjected to a process which results in the article having a name,

character or use different from that of the imported article."  *Precision Specialty Metals,*

*Inc. v. United States*, 24 CIT 1016, 1029, 116 F. Supp. 2d 1350, 1364 (2000)

(considering whether stainless steel scrap was manufactured or produced within the

meaning of the manufacturing substitution drawback statute).  Use of this test to

determine whether a substantial transformation has occurred has been confirmed by the

Federal Circuit.  *See, e.g., Belcrest Linens v. United States*, 741 F.2d 1368, 1372 (Fed.

Cir. 1984) (substantial transformation occurs when there has been a change in name,

character or use, and this test has been developed in customs law generally); *Superior*

*Wire v. United States*, 867 F.2d 1409, 1414 (Fed. Cir. 1989) (in determining country of

origin pursuant to a voluntary restraint agreement, the court confirmed that "substantial

transformation requires that there must be a transformation; a new and different article

must emerge, having a distinctive name, character, or use") (internal quotation marks

and citations omitted).

        In applying the substantial transformation test, courts generally agree that each

case must be decided on its facts.  *See Nat'l Hand Tool Corp.*, 16 CIT at 311 (in a case

involving some post importation heat treatment and electroplating of hand tool

components that were then assembled to produce flex sockets, speeder handles and flex handles in a process that required some skill and dexterity to put components together with a screw driver; the court noted that "each case must be decided on its own particular facts"); *Uniroyal, Inc.*, 3 CIT at 224, 542 F. Supp. at 1029 (in a case in which imported shoe uppers were attached to soles in the United States, the court noted the fact-specific nature of the inquiry).  Federal Circuit case law also discusses the fact-specific nature of substantial transformation cases, noting that "courts have been reluctant to lay down specific definitions in this area of the law other than to discuss the particular facts of cases." *Belcrest Linens*, 741 F.2d at 1372.  The case law also indicates that a determination of substantial transformation must be based on a totality of factors.  *See, e.g., Nat'l Hand Tool Corp.,* 16 CIT at 312; *Ran-Paige*, 35 Fed. Cl. at 121.

Courts have primarily focused on changes in use or character.  *Precision Specialty*, 24 CIT at 1029, 116 F. Supp. 2d at 1364.  "The name criterion is generally considered the least compelling of the factors which will support a finding of substantial transformation." *Ferrostaal Metals Corp. v. United States*, 11 CIT 470, 478, 664 F. Supp. 535, 541 (1987) (subject merchandise was not covered by an arrangement between the governments of Japan and the United States because annealing and galvanizing operations performed in New Zealand had substantially transformed the Japanese cold rolled steel sheet); *see also Superior Wire, a Div. of Superior Prods. Co., a Michigan Corp. v. United States,* 11 CIT 608, 617, 669 F. Supp. 472, 480 (1987), *aff'd,*

867 F.2d 1409 (Fed. Cir. 1989) (when only a change in name is found, "such a change

has rarely been dispositive").

 "Character" is defined as the "mark, sign [or] distinctive quality" of a thing.

Webster's Third New Int'l Dictionary of the English Language Unabridged (2002) at 376.

For courts to find a change in character, there often needs to be a substantial alteration

in the characteristics of the article or components.  *See, e.g.*, *Ran-Paige*, 35 Fed. Cl. at

121; *Nat'l Hand Tool*, 16 CIT at 311.  Changes that are deemed cosmetic are

insufficient for a finding of substantial transformation.  *See, e.g., Superior Wire*, 867

F.2d at 1414.  The court previously has found a change in character when a "continuous

hot-dip galvanizing process transforms a strong, brittle product which cannot be formed

into a durable, corrosion-resistant product which is less hard, but formable for a range of

commercial applications," *Ferrostaal Metals*, 11 CIT at 477, 664 F. Supp. at 540, but not

when the "form of the components remained the same" and a heating process

"change[d] the microstructure of the material, but there was no change in the chemical

composition" such that, while there were changes in the "characteristics of the material,

they d[id] not change the character of the articles."  *Nat'l Hand Tool*, 16 CIT at 311.

In other cases, the court has looked to the "essence" of a completed article to

determine whether an imported article has undergone a change in character as a result

of post-importation processing.  *See Uniden America Corp. v. United States*, 24 CIT

1191, 1195-97, 120 F. Supp. 2d 1091, 1095-1098 (2000) (in a GSP case in which a

cordless telephone consisted of 275 parts sourced in the Philippines and third-countries

and an A/C adapter imported pre-assembled in China, the court found that the A/C

adapter did not impart the essential character of the cordless telephone and thus, did

not undermine the conclusion that the cordless telephone's other imported parts, once

assembled together, had undergone a substantial transformation and were a product of

a beneficiary developing country ("BDC")); *see also Uniroyal*, 3 CIT at 225, 542 F. Supp.

at 1030 (imported shoe uppers were the "essence of the finished shoe" and were not

substantially transformed by the addition of an outer sole in the United States).  When,

as here, the post-importation processing consists of assembly, courts have been

reluctant to find a change in character, particularly when the imported articles do not

undergo a physical change.  *See, e.g., Uniroyal*, 3 CIT at 226, 542 F. Supp. at 1031.

    In analyzing any change in use, the court has previously found that such a

change occurred when the end-use of the imported product was no longer

interchangeable with the end-use of the product after post-importation processing.  *See*

*Ferrostaal Metals,* 11 CIT at 477, 664 F. Supp. at 540-41 (the court found "substantial

changes in the use of the [imported cold-rolled] steel sheet as a result of the continuous

hot-dip galvanizing process" because "the frequency with which the two types of steel

compete with or are interchangeable with each other is 'very limited,' perhaps less than

one or two percent.").  However, when the end-use was pre-determined at the time of

importation, courts have generally not found a change in use.  *See, e.g.*, *Nat'l Hand*

*Tool*, 16 CIT at 311-312 (when post-importation processing primarily consisted of an

assembly process, having one pre-determined end-use at the time of importation does

not preclude a finding of substantial transformation; however, based on the totality of

the evidence, the court did not find substantial transformation had occurred); *see also*

*Ran-Paige,* 35 Fed. Cl. at 121-122 (when post-importation processing consisted

primarily of attaching handles to pans and covers the court likened it to *Nat'l Hand Tool*

when "plaintiff did not change the use of the components, especially given the fact that

the use was predetermined at the time of importation"); *Uniroyal*, 3 CIT at 226, 542 F.

Supp. at 1031 (the court did not find substantial transformation when the imported upper

underwent no physical change, "[n]or was its intended use changed.  It was

manufactured by plaintiff in Indonesia to be attached to an outsole; it was imported and

sold to Stride-Rite for that purpose; and Stride-Rite did no more than complete the

contemplated process").

In addition to name, character, and use, courts have also considered subsidiary

or additional factors, such as the extent and nature of operations performed, value

added during post-importation processing, a change from producer to consumer goods,

or a shift in tariff provisions.[14]  Consideration of subsidiary or additional factors is not

consistent, and there is no uniform or exhaustive list of acceptable factors.  For

---

[14] Courts have also occasionally, but inconsistently, considered subsidiary or additional tests.  *See, e.g.*, *Superior Wire*, 11 CIT at 615, 669 F. Supp. at 478 (describing these as "additional factors" or "cross check[s]"); *Precision Specialty Metals*, 24 CIT at 1029, 116 F. Supp. 2d at 1364 (courts have "turn[ed] to various subsidiary tests depending on the situation"); *Koru North Am. v. United States*, 12 CIT 1120, 1127, 701 F. Supp. 229, 235 (1988) (describing one such factor as "additional evidence of substantial transformation").  There is no exhaustive list of acceptable subsidiary tests, but courts have considered changes in tariff classification, *see, e.g., Ferrostaal Metals Corp.,* 11 CIT at 478, 664 F. Supp. at 541, change from producer goods to consumer goods, *see, e.g., Midwood Indus. Inc., v. United States*, 64 Cust. Ct. 499, 507-508, 313 F. Supp. 951, 957 (1970), value added as a result of processing, *see, e.g., Superior Wire,* 11 CIT at 614, 669 F. Supp. at 478; *but see, Nat'l Hand Tool*, 16 CIT at 312, and the extent and nature of operations performed, *see, e.g., Ran-Paige,* 35 Fed. Cl. at 121; *Belcrest Linens*, 741 F.2d at 1371; *Uniroyal,* 3 CIT at 226, 542 F. Supp. at 1031.

example, the court is split on whether to consider value added or costs incurred as a

factor.  *See Superior Wire*, 11 CIT at 614, 669 F. Supp. at 478 ("[a]n inquiry that is

sometimes treated as a type of cross-check or additional factor to be considered in

substantial transformation cases is whether significant value is added or costs are

incurred by the process at issue"); *but see Nat'l Hand Tool*, 16 CIT at 312 (rejecting

value added as a factor because it "could lead to inconsistent marking requirements for

importers who perform exactly the same processes on imported merchandise but sell at

different prices").  In particular, courts have attempted to distinguish between minor

manufacturing and combining operations or simple assembly, and processing that is

more complex.  *See, e.g., Uniroyal,* 3 CIT at 226, 542 F. Supp. at 1031; *Belcrest Linens*,

741 F.2d at 1371; *Ran-Paige*, 35 Fed. Cl. at 121.

　　　In cases in which the post-importation processing entails assembly, courts have

considered the nature of the assembly together with the name, character, or use test in

making a substantial transformation determination.  *See Ran-Paige*, 35 Fed. Cl. at 121;

*Belcrest Linens*, 741 F.2d at 1371; *Uniroyal*, 3 CIT at 226; 542 F. Supp. at 1031.  The

Federal Circuit, in *Belcrest Linens,* considered the difference between minor

manufacturing and combining operations and substantial transformation when stenciled,

marked and embroidered bolts of cloth were cut into individual pieces, scalloped, folded,

sewn, pressed and packaged, and found that substantial transformation had occurred

based on "the extent of the operations performed and whether the parts lose their

identity and become an integral part of a new article."[15]  *Belcrest Linens*, 741 F.2d at

1373.  However, when assembly operations were manual and required some "skill and

dexterity to put components together with a screw driver" but the names of each article

and the form and character of each component remained unchanged, and the use of

the imported articles was predetermined at the time of importation, the court did not find

that substantial transformation had occurred.[16]  *Nat'l Hand Tool,* 16 CIT at 310-313.

The court has sometimes compared the degree of operations in pre- versus post-

importation processing to evaluate whether a substantial transformation occurred.  For

example, in *Nat'l Hand Tool*, the court contrasted the pre-importation processing of cold

forming and hot-forging and noted that it required more complicated functions than post-

importation processing, which included heat treatment and electroplating.  16 CIT at

311; *see also Uniroyal*, 3 CIT at 224-227, 542 F. Supp. at 1029-31 (comparing a post-

importation "minor manufacturing or combining process" in which imported shoe uppers

were attached to outsoles with "complex manufacturing processes" that occurred pre-

importation when the imported uppers were produced).  In a 1979 Act case concerning

substantial transformation, the Court of Federal Claims did not focus on the nature of

assembly operations except for characterizing them as an "attachment process," *Ran-*

---

[15] In *Belcrest Linens*, bolts of cotton were stenciled, marked and embroidered in China, and then cut into individual pieces, scalloped, folded, sewn, pressed and packaged in Hong Kong.  The court found that the processing in Hong Kong transformed the fabric imported from China into pillowcases, which are "clearly distinguishable in character and use from the fabric of which they were made." *Belcrest Linens*, 741 F.2d at 1374.
[16] The case involved imported hand tool components that were assembled post-importation to produce flex sockets, speeder handles and flex handles.  Prior to assembly, but after importation, the articles were also heat treated and electroplated.

*Paige*, 35 Fed. Cl. at 119-122, but found there was no substantial transformation because the name and character of the imported articles (pans and handles) did not change, and the end-use of the imported articles was pre-determined at the time of importation.[17]  *See generally id.* at 120-122.  While courts consider the nature of post-importation processing in their substantial transformation analysis, there is no bright line rule on the number of components required or the minimum amount of time spent on assembly before an assembly process is no longer considered  "simple assembly" or "combining operations" and is, instead, considered substantial transformation.

Based upon the application of the above guidance to the undisputed facts of this case, the court finds that the assembly operations at the Vermont facility do not result in a substantial transformation of the imported components.  Plaintiff and Defendant agree that the post-importation assembly operations do not result in a change in the shape or material composition of any imported component.  *See* Def.'s SOF ¶¶ 24-25; Pl.'s Resp. to Def.'s SOF ¶¶ 24-25.  As such, there is no change in character as a result of Energizer's assembly operations.[18]  Thus, whether there has been a substantial

---

[17] In *Ran-Paige* the post-importation processing consisted of fastening the handles onto the pans and covers.  *See Ran-Paige*, 35 Fed. Cl. at 120.

[18] Plaintiff does offer a series of arguments related to an "essential character" analysis, starting with an assertion that CBP disproportionately relied upon that test in its Final Determination.  Pl.'s MSJ at 13-18.  Plaintiff argues that the white LED "does not impart the essential character of the Gen[eration] II flashlight" because its design characteristics are not limited to the manufacture of a flashlight and it could be used in a "multitude of light emitting devices," and further that it requires post-importation processing in the United States before it is incorporated into the Generation II flashlight.  *Id.* at 14-15.  Further, Plaintiff argues that "[t]he white LED is only one of five LEDs in the Gen[eration] II flashlight," all of which are "incapable of illumination or signaling

transformation depends on whether there has been a change in the name or use of the

components.  Plaintiff argues that the Generation II flashlight's imported components

undergo a change in name and use, specifically, that none of the components could

function as a flashlight prior to assembly and that they become integral parts of a new

product as a result of the assembly.  Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Pl.'s

Resp.") at 5-6, ECF No. 50.  Plaintiff's arguments are unavailing.

---

without the printed circuit board, batteries and U.S. origin firmware." *Id.* at 15-16.
Arguing in the alternative, Plaintiff then asserts that if "one of five LEDs imparts the
essential character to the complete flashlight, [its] origin is the United States, not China"
because "[t]he white LED wafer is grown in the United States" and then "exported to
China where it is merely mounted and coated with resin to make it easier for producers
like Energizer to use the LED." *Id.* at 17-18.  Defendant responds that Customs'
analysis in the Final Determination is not "germane to the court's *de novo* review," and
that "even if the white LED were a product of the United States, all of the remaining
components, other than the hydrogen getter, are of Chinese origin and would have to
be substantially transformed for the G[eneration] II flashlight to be considered a U.S.-
originating good."  Def.'s Resp. at 9.  As noted above, some courts have looked to the
essence of a finished article or product in order to evaluate whether there has been a
change in character as a result of post-importation processing, however an "essential
character" test is not consistently used in substantial transformation analysis.  More so
than the "essence" of a finished article, courts look for substantial alteration in or
changes to material composition of an article or components. *See Ran-Paige*, 35 Fed.
Cl. at 121; *Nat'l Hand Tool*, 16 CIT at 311; *Ferrostaal Metals*, 11 CIT at 477-78, 664 F.
Supp. at 540.  When the post-importation processing entails assembly, the court has
considered whether components had a pre-determined use at the time of importation
and if such use remained unchanged after post-importation processing. *See Nat'l Hand
Tool*, 16 CIT at 311; *Uniroyal*, 3 CIT at 226, 542 F. Supp. at 1031.  In the instant
proceeding, Plaintiff and Defendant agree that the assembly operations in Vermont do
not result in a change in shape or material composition of any imported component, and
Plaintiff primarily argues that the white LED does not impart the essence of a
Generation II flashlight.  Pl.'s MSJ at 15.  Because essential character is, at best, a
subsidiary consideration, the court declines to adopt an essential character analysis.

Plaintiff's imported components do not undergo a change in name when they are assembled into a flashlight at the Vermont facility.  While the court is not bound by *Nat'l Hand Tool*, that case is exactly on point.  In *Nat'l Hand Tool*, the "name of each article as imported" remained the same as that article in the "completed tool."  16 CIT at 311. For instance, a lug, called a "G-head" at the time of importation, was still called a "G-head" even after it was assembled into a completed flex handle.  *Id.*  Plaintiff argues that none of Energizer's articles are called "flashlight" at the time of importation, but that is a simplistic reading of *Nat'l Hand Tool.*  The issue is not whether Plaintiff imported approximately fifty "flashlights," but rather whether the Plaintiff's imported components retained their names after they were assembled into the Generation II flashlight.  Thus, the proper query would be whether the "lens ring with overmold" or the "switch lever" or the "TIR lens" or any of the LEDs or any other components would still be called by their pre-importation name after assembly into the finished flashlight, or whether they would be indistinguishable in name from the finished product.  The constitutive components of the Generation II flashlight do not lose their individual names as a result the post-importation assembly.  The court finds, based on the undisputed facts presented, that no such name change occurred.

Energizer's imported components also do not undergo a change in use as a result of the post-importation processing at its Vermont facility.  Arguing that its assembly process is meaningful and transformative, Plaintiff claims that none of the Generation II flashlight components could function as a flashlight at the time of importation and all of them become integral parts of a new commercial product.  Pl.'s

Resp. at 7.  However, in doing so Plaintiff misconstrues the holdings in *Nat'l Hand Tool*

and *Ran-Paige.*  The proper query for this case is not whether the components as

imported have the form and function of the final product, but whether the components

have a pre-determined end-use at the time of importation.  When articles are imported

in prefabricated form with a pre-determined use, the assembly of those articles into the

final product, without more, may not rise to the level of substantial transformation.  *See,*

*e.g., Uniroyal*, 3 CIT at 226, 542 F. Supp. at 1031.  Plaintiff imports a partially

assembled lens head, with four of the five LEDs pre-attached and pre-cut wires

soldered to the head PCB.  *See* Def.'s SOF ¶¶ 14-16; Pl.'s Resp. to Def.'s SOF ¶¶ 14-

16.  The partially assembled lens head and remaining Generation II flashlight

components are then assembled into the Generation II flashlight at the Vermont facility.

*See supra* p. 5-6.  All of Plaintiff's imported components have a pre-determined end-use

as parts and components of a Generation II flashlight at the time of importation.  Even

the imported wire has been pre-cut to the particular lengths needed to assemble the

flashlight.  Def.'s SOF ¶ 14; Pl.'s Resp. to Def.'s SOF ¶ 14.  Thus, the court finds, based

on the undisputed material facts before it, that Plaintiff's imported components do not

undergo a change in use due to Energizer's post-importation assembly process.[19]

_____

[19] Plaintiff also argues that, according to the producer versus consumer goods test laid
out in *Midwood Industries*, the processing at the Vermont facility should constitute
substantial transformation because the imported components of the Generation II
flashlight are producer goods and the Generation II flashlight is a consumer good.  Pl.'s
MSJ at 19.  In *Midwood Industries,* imported steel forgings were converted into flanges
and fittings in a process that included cutting, boring, tapering and beveling the ends,
heating and reducing the diameter of one end and then aligning, trimming and beveling

Finally, the court finds that Plaintiff's post-importation processing is not

sufficiently complex as to constitute a substantial transformation.  Plaintiff argues that its

operations are not simple assembly but rather "complex, meaningful and

transformative."  Pl.'s Resp. at 5-6.  However, as proof of the complexity of its assembly

process Plaintiff offers only the length of time it takes to assemble the Generation II

flashlight and the total number of components involved.  Pl.'s Resp. at 7.  As noted

above, there is no bright line rule for the minimum number of components required for

an assembly process to constitute a substantial transformation.  *See supra*, at 21-23.

Moreover, Plaintiff's assembly process, regardless of length of time or number of

components does not rise above simple assembly.  Plaintiff claims that the Generation

II flashlight is comprised of approximately fifty components, including a lens head

subassembly that is in fact imported from China in partially pre-assembled form.  *See*

---

it for welding purposes, subjecting the flanges and fittings to chemical baths, and giving
them a final heat treatment and rustproof coating.  *Midwood Industries*, 64 Cust. Ct. at
504.  As a result of this post-importation processing, the imported articles were
transformed from producer goods not capable of use by a consumer, to consumer
goods that had use and appeal for industrial users and distributors of industrial
products.  *Id.* at 505-08, 313 F. Supp. at 955-57.  Plaintiff offers nothing further than
conclusory statements that "the white LED is a producer's good and the Gen[eration] II
flashlight is a consumer's good," Pl.'s MSJ at 19, that "the imported components lose
their identity as producers' goods," and that "[t]he imported articles in this case are
properly considered 'producers' goods,' but the Gen[eration] II flashlight is a consumer's
good,"  Pl.'s Resp. at 6 and n. 1.  Plaintiff's argument fails because the post-importation
industrial processing in *Midwood Industries* is not comparable to the assembly carried
out by Energizer.  Further, as a result of the processing in *Midwood Industries*, the
imported articles underwent a change in name, use, and character, whereas Energizer's
imported parts do not.

*supra* at note 2.  Nineteen of the approximately fifty components (i.e., almost 40

percent) are screws, washers, or nuts.  *Id.*  The wires used in the Generation II flashlight

are imported "pre-cut" to lengths specifically required for the Generation II flashlight

assembly.  Def.'s SOF ¶ 14; Pl.'s Resp. to Def.'s SOF ¶ 14.  As Defendant notes, these

components are "the mechanisms by which the other components are held together."

*See* Def.'s Resp. to the Court's Letter Dated June 30, 2016 ("Def.'s Resp. to Court's

Letter") at 1, ECF No. 57.  Both Plaintiff and Defendant agree that the number of

screws, washers or nuts is not outcome determinative and that the court should instead

focus on the complexity and meaningfulness of the operations performed.  *See* Def.'s

Resp. to Court's Letter at 1-2; Pl. Energizer Battery, Inc.'s Resp. to the Court's Question

of June 30, 2016 ("Pl.'s Resp. to Court's Letter") at 2-3, ECF No. 56.  While the court

agrees that the number of screws, washers or nuts is not outcome determinative, the

high proportion of such connective parts relative to other components supports the

court's finding that the imported components do not undergo a change in character and,

instead, are simply held together as an aggregate product after assembly.

Plaintiff also argues that the length of time it takes to complete the assembly

operation and its complexity should lead the court to find that there is a substantial

transformation.   *See* Pl.'s Resp. at 5, 7.  Plaintiff states that its assembly process is

conducted by "trained technicians" and takes approximately seven minutes (including

testing) but there is no evidence as to the level or type of training required of the

technicians.  *Id.* at 7.  In fact, the same assembly process completed by technicians that

Plaintiff stated were not fully trained only took six minutes longer (including testing and

packaging) in the demonstrative DVD submitted to the court.  Pl.'s DVD; Def.'s DVD.

When asked to describe the assembly process for the court, Plaintiff used the following

terms: selects, places, assembles, solders, inserts, screws, align[s], stretche[s], twist[s],

connects, attaches, feeds, presse[s] together, places, fasten[s], rotate[s] and test[s].

*See* Pl.'s Suppl. Facts at 5-16;[20] *see also* Def.'s MSJ, Ex. 8 ("Assembly Instruction

Sheets"), ECF No. 38-9; Def.'s MSJ, Ex. 15 ("Assembly Instructions with Estimated

Completion Times"), ECF No. 38-15; Energizer Ruling Req., Confidential Attach. H

("Job Breakdown Instructions") at 49-61, ECF No. 41-1.  Thus, the post-importation

processing can take anywhere from seven to thirteen and a half minutes, including

testing and packaging, depending on the technician's level of training, and the nature of

the assembly is broadly described as assembling, screwing, connecting and soldering

approximately fifty components, many of which are simple attaching mechanisms.

None of these factors suggest an assembly process that is complex.  Indeed, the court

has viewed the DVD provided as an exhibit and is persuaded that it is a simple,

screwdriver assembly akin to those described in *Ran-Paige* and *Nat'l Hand Tool*.  Given

---

[20] At the court's request, Plaintiff provided a narrative summary of the assembly
process.  Pl.'s Suppl. Facts at 5-16.  Defendant admitted that "Energizer ha[d] set forth
a narrative summary of the assembly process, but aver[red] that the video of the
assembly process is the best evidence of the operations performed in St. Albans,
Vermont."  Def.'s Resp. to Pl.'s Suppl. Facts at 18.  The court has reviewed the videos
of the assembly process and has compared the Plaintiff's narrative summary with the
job breakdown instructions included in Plaintiff's ruling request to CBP, Job Breakdown
Instructions, and the assembly instructions provided by Defendant as part of its exhibits
to its own motion for summary judgment and found them to be consistent with one
another.  Assembly Instruction Sheets; Assembly Instructions with Estimated
Completion Times.

the relative simplicity of the assembly process, as evidenced by the language used to describe it, the length of time it takes, and the proportion of components that can be categorized as attaching mechanisms, the court finds that the imported parts do not undergo a substantial transformation.

Plaintiff cites to *Belcrest Linens* for the proposition that "in determining whether the combining of parts or materials constitutes a substantial transformation, the issue has been the extent of the operations performed and whether the parts lose their identity and become an integral part of a new article." Pl.'s Resp. at 7 (citing *Belcrest Linens*, 741 F.2d at 1373) (formatting omitted). However, in *Belcrest Linens* the operations performed resulted in a bolt of cloth being cut, scalloped and sewn into pillowcases. *Belcrest Linens*, 741 F.2d at 1374. Similarly, in a Customs Court case cited by *Belcrest Linens*, *Carlson Furniture Indus. v. United States*, 65 Cust. Ct. 474 (1970), the court found that the imported articles were not chairs in unassembled form but "at best[,] the wooden parts which go into the making of chairs," and that most of the chair parts still required surface finishing and upholstering, the chair legs needed to be cut to length, leveled and fitted with glides and casters, and plaintiff had to then assemble, fit, glue and pin the various parts together. 65 Cust. Ct. at 482. The court found that these operations were substantial in nature and more than the mere assembly of parts together. *Id.* In contrast, given that Plaintiff's assembly process is a fitting together of parts and that all its components are imported with a pre-determined end-use and arrive ready for assembly, the court finds the present case distinguishable from *Belcrest Linens* and *Carlson Furniture.* Unlike the wooden parts in *Carlson*

*Furniture* or the marked bolts of cloth in *Belcrest Linens*, Energizer does no further work on the imported components except assemble them together.[21]

Finally, Plaintiff cites to its U.S. production cost and NAFTA guidance on assembly to argue that its operations rise to the level of substantial transformation.  Pl.'s MSJ at 11; Pl.'s Resp. at 8.  Plaintiff's arguments are unavailing.  Plaintiff notes that "U.S. production cost is, by far, the single largest cost in the production of the Gen[eration] II flashlight" and that "of the Gen[eration] II flashlight's combined $23.55 in parts and U.S. production costs, 45 [percent] is U.S. production costs."  Pl.'s MSJ at 11.  However, cost of U.S. production is, at best, a subsidiary factor in a substantial transformation analysis, and the court in *Nat'l Hand Tool* specifically rejected U.S. expenditures as a basis for determining substantial transformation.  *Nat'l Hand Tool*, 16 CIT at 312.  Plaintiff states that forty-five percent of the total cost of the Generation II flashlight is attributable to U.S. labor and production (including direct labor, variable expenses and fixed costs).  Pl.'s MSJ at 11; *see also,* Pl.'s SOF ¶¶ 52-53; Def.'s Resp. to Pl.'s SOF ¶¶ 52-53.  Defendant asserts that Plaintiff "compares aggregated labor costs with disaggregated parts costs" and leaves out the "costs associated with the partial assembly of the lens head in China."[22]  Def.'s Resp. at 7.  Thus, Defendant

---

[21] It is also of note that while the finished pillows in *Belcrest Linens* could never be returned to their pre-processing form of bolts of cloth, it is conceivable that Energizer's Generation II flashlight could in fact be disassembled.  Thus, it is questionable whether all of Plaintiff's imported components have in fact become *integral* parts of a new article.
[22] The court's review of the evidence indicates that Plaintiff did include the cost of labor for the sub-assembly in China, identified as "Sonco labor to assemble and export" in the Macro Cost Sheets included as part of Plaintiff's Customs List.  Customs List at 18.  To

argues, that "no valid conclusions can be drawn from Energizer's comparison of the costs of labor and parts." *Id.*   Regardless of the exact numbers, when U.S. costs are attributed to approximately seven minutes of labor, the court will not accord undue weight to the value of that labor for the purposes of its substantial transformation analysis.

Similarly, Plaintiff cites to the "more concrete rules of free trade agreements, such as NAFTA, for guidance," in which simple assembly is defined as the "fitting together of five or fewer parts," to support its claim that the operations at its Vermont facility are more than simple assembly.  Pl.'s Resp. at 8, citing 19 CFR ¶ 102.1(o). However, this comparison is inapposite because NAFTA is a specialized trade regime, the benefits of which do not mirror the more generalized "most favored nation" treatment afforded to countries not party to the agreement in question.  This is consistent with the object and purpose of the 1979 Act, which is to give preferential status to certain designated countries, most of which have a pre-existing agreement with the United States and offer reciprocal government procurement benefits.  Thus, the more permissive understanding of "simple assembly" found in regulations pertaining to NAFTA may have been intentionally designed to relax the rules on country of origin in order to facilitate trade with the agreement partners; however, the same cannot be said of the concept of country of origin in the 1979 Act.

---

the extent that these facts are in dispute, as discussed earlier, they are not material to the court's decision.

The court finds that Energizer's imported components do not undergo a change in name, character, or use as a result of the post-importation processing in the United States, and that the nature of Energizer's post-importation assembly process is not sufficiently complex to give rise to a substantial transformation.  Based on the totality of the undisputed material facts before the court, Energizer's post-importation processing at its Vermont facility does not result in a substantial transformation of the Generation II flashlight components imported by Plaintiff.  China is the correct country of origin of the Generation II flashlight pursuant to the government procurement provisions of the 1979 Act.

## Conclusion

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is denied, and Defendant's Motion for Summary Judgment is granted.  Judgment will enter accordingly.

/s/     Mark A. Barnett
Mark A. Barnett, Judge

Dated: December 7, 2016
New York, New York